## District Court, U. S.

## NEW-YORK, AUGUST, 1818.

| | |
|---|---|
| Thomas Stoughton, Consul of his Catholic Majesty, the King of Spain, on behalf of the owner or owners of the Spanish Felucca, or vessel, called the General Morales, and the cargo thereof, vs. Thomas Taylor. | Trespass, civil and maritime.——Damages laid at $35,000. |
| The Same, On behalf of the owner or owners of the Spanish brig Teneriffe, and the cargo thereof, vs. The Same. | The like.——Damages $40,000. |
| The Same, On behalf of Juan Juando and others, vs. The Same. | The like.——Damages $25,000. |

The facts of this case may be learned from the following decision.

*Dicision of* VAN NESS, J. The orders to hold the defendant to bail in these cases were granted on the exhibition of several affidavits, stating the defendant to be an American citizen, and to have been concerned, sometime in the year 1816, in fitting out and arming a brig, or vessel, called the Fourth of July, or El Patriota, within the limits of the United States; to have proceeded in her to sea, and, under the flag of the government of Buenos Ayres, to have cruized against the property of the subjects of the king of Spain, and to have captured merchandize to a large amount, belonging to the individuals in whose behalf these suits have been instituted by the Consul of his Catholic Majesty. At a subsequent day, the defendant, by his counsel, applied for, and obtained an order, directing the plaintiff to show cause why he should not be discharged from custody on filing common bail. The application was founded on and supported by the defendant's affidavit, stating, that he was born a subject of the king of Great Britain, but was now, and had ever since the year one thousand eight hundred and thirteen, been a naturalized citizen of the United Provinces of South America. In support of this last fact he produced his certificate of naturalization. He farther stated, that at the time he took the command of the aforesaid vessel, he was, and still is, an officer in the naval service of that government, and verified that fact by the production of his commissions; one of which bears date so early as the year 1814. He denied also all participation in fitting out or arming the said vessel; and alleged, that in his public capacity, as an officer of the government of Buenos Ayres, he had

NEW-YORK,
1818.

Stoughton
v.
Taylor.

purchased, and contracted for the delivery of the said vessel, at some place beyond the limits of the United States. That she was accordingly delivered to him more than a marine league from the coast of the United States, and produced a bill of sale, dated at sea, to verify the fact. The counsel for the plaintiff strenuously opposed the reading of this affidavit, on the ground, that according to the practice of the Supreme Court of this state, where the debt is positively sworn to, no counter affidavit can be received. This, to be sure, appears to be the practice of our Supreme Court, derived from the King's Bench.—In the Common Pleas of England it is not so. There, counter and contradictory affidavits are received, and the matter of bail held examinable in that way. But whatever may be the practice of these courts, this is a case to which the rule does not and cannot apply. This is not an action of debt, or of assumpsit: it is founded on an alleged trespass : the acts complained of are not denied, but justified ; and whether the defendant is at all liable to · arrest for having committed them, is purely a question of law—a question depending, not on the laws of any particular country, but on the public law of nations ; and on which I think the party is entitled to a decision in this stage of the proceedings ; the more so, because in this action bail is not a matter of course, and it lies with the plaintiff to show himself entitled to hold the defendant in custody. This affidavit being re ceived, farther time is asked, to show, by supplementa- ry affidavits, that although the defendant, as he has sta- ted, may be a native of the island of Bermuda, and may have been thus born a subject of the king of Great Bri- tain, yet he is a citizen of the United States by naturali- zation. The time required to substantiate this fact hav-

ing been allowed, farther affidavits have been produced by both sides in relation to this point. I shall not examine them minutely, because, on farther reflection, I do not consider the fact material. If the defendant was ever a citizen of these states, he is no longer so. If the right of expatriation was ever exercised by any individual, it certainly has been by him. If the exercise of that right can ever be effectual, it must be so in this case.

The occasion will not permit me to go into a full examination of the principles of public law in reference to this right of expatriation. I think, however, that it can be maintained under the established law of nations, and even by the laws and the practice of those who have become the most strenuous advocates, for what may be termed the modern doctrine of perpetual allegiance—a doctrine which grew out of the feudal system, and was supported upon a principle which became imperative with the obligations on which it was founded.

In this country expatriation is conceived to be a fundamental right. As far as the principles maintained, and the practice adopted by the government of the United States is evidence of its existence, it is fully recognized. It is constantly exercised, and has never in any way been restrained.

The general evidence of expatriation is actual emigration, with other concurrent acts, showing a determination and intention to transfer his allegiance.

The evidence in this case is, emigration more than twelve years since—swearing allegiance to another government eight years ago—entering into its service, and continuing in it uniformly from that time to this. On this evidence, I cannot hesitate to say, that the de-

NEW-YORK,
1818.

Stoughton
v.
Taylor.

fendant has lost his character as a citizen of the United States; he has abandoned his rights as such; he cannot now claim them, and cannot be called on to perform any of the duties incident to that character. It may, perhaps, be said, that the government to which he has sworn allegiance is not independent, and that the act is therefore inoperative and void. If that were so, yet the fact of emigration, and the evidence of the *animus manendi*—the intention to remain abroad, and to abandon his citizenship here, as manifested by his oath of allegiance to another government, claiming to be independent, are sufficient to sustain his expatriation. In whatever light the government to which he professes to belong may be viewed by other nations, it is independent in fact, and may forever remain so, although not recognized in form. The obligation, therefore, which the defendant has contracted, I conceive to be binding on him, and utterly incompatible with allegiance or citizenship elsewhere.

Although 1 am satisfied with this view of the subject, there is another circumstance well worthy of consideration:

It appears that the defendant was in the naval service of Great Britain immediately antecedent to his becoming a resident in Buenos Ayres, and assuming allegiance to the government of that country. It is well known, that upon the principles maintained by the British government, the native character, if, under any circumstances, it can temporarily be lost, easily reverts. A return to the country, or into its military or naval service, restores it. In the view of that government, therefore, the defendant was completely a British subject prior to his becoming a citizen of the United Pro-

vinces of South America. I am inclined to think, that even here, this return to the service of his native country must be considered an abandonment and forfeiture of his citizenship.

Under all the circumstances of the case, I am clearly of opinion that the defendant is no longer a citizen of this country.

Not being a citizen of the United States, the question is presented broadly, whether this court will take cognizance of this case? or rather, whether it will order the defendant to be arrested, and held to bail, for acts committed against the subjects of the royal government of Spain, in his capacity of a citizen and public officer of the government of the United Provinces of Rio de la Plata, claiming to be independent?

Our own citizens can at all times appeal to the tribunals of their own country to enforce their rights; and through the intervention of the same means, they can be coerced to a performance of their duties. In the application, moreover, of our own laws to their conduct, or to questions growing out of a war between a foreign prince and his subjects, this court may find it necessary to decide upon the political independence of a foreign people; but I know of no principle of the law of nations, and certainly there is no municipal law, that authorizes, or at least requires it to take cognizance of questions arising between a foreign monarch and a portion of his subjects.

The law of nations, as promulgated by the most respectable authorities, and as illustrated by the usages and practice of modern times, affords, I think, a sufficient and distinct rule for our government in cases of this sort.

It is well settled, that when one portion of an empire

NEW-YORK,  rises up against another, and no longer obeys the sove-
1818.    reign, but by force of arms, throws off his authority, and is
Stoughton   of sufficient strength to compel him to resort to regular
v.
Taylor.    hostilities against it, a state of *civil war* exists, as distin-
guished from *rebellion*.   It is equally well settled, that
in the prosecution of a civil war all the maxims of hu-
manity and moderation, inculcated by the common laws
of war, should be observed.   The same case in which
these principles are found, points out the course to be
pursued by foreign nations in such a crisis.   It expressly
requires, that they consider the conflicting parties as
two distinct powers, each independent of all foreign
authority—contending for rights and for a dominion
which no foreign government can justly give or take
away; and, therefore, in the words of this great autho-
rity, " nobody has a right to judge them."

It is said that this government of Buenos Ayres, not
having been recognized by our own as free and inde-
pendent, it cannot be recognized as such by this court ;
and its decision in the case of the American Eagle is
cited to show that this position was adopted in that
case.—Certainly it was, and so it will be here, without
affording any aid to the plaintiff's case, for it will be
sufficiently shown in the progress of this investigation,
that such recognition, either by the government or this
court, is not necessary to entitle the defendant to his
discharge.   Most assuredly I am not now to determine
what would be the operation of a municipal law, inter-
dicting trade and intercourse with a foreign prince or
state.   If that were necessary, I should decide now as I
did then, that it did not prohibit trade with a power
not recognized by our government as independent.   But,
with great respect to the dicta of learned men—very

learned, no doubt, in equity and common law, I maintain that it is a question which has nothing to do with that now before the court; and no claim to infallibility, however vainly and presumptuously upheld, can obliterate the distinctions between the operation of a local act, intended to regulate our trade, and the conduct of our own citizens, and the great principles of public law, whose coercive efficacy pervades the civilized world.

The question is, not whether the government of Buenos Ayres be a foreign prince or state, but whether a civil war is raging between that colony and the government to which it once professed allegiance; and if there be, in what light the parties are to be viewed by foreign and neutral nations. The solution of this question will scarcely be found in Maddock or in Blake; but that they are to be considered as nations at war, and on an equal footing, as to all the purposes of the war in which they are engaged, is the clear and explicit law of nations.

"When a party is formed in a state, which no longer obeys the sovereign, and is of strength sufficient to make head against him, this is called a civil war."

"A civil war breaks the bands of society and government; or, at least, it suspends their force and effect."

"When a nation becomes divided into two parties, absolutely independent, and no longer acknowledging a common superior, the state is dissolved, and the war between the two parties stands on the same ground in every respect as a public war between two different nations."

"This being the case, it is very evident that the common laws of war, those maxims of humanity, moderation, and honour, which we have already detailed in the

NEW-YORK, 1818.

Stoughton
v.
Taylor.

course of this work, ought to be observed by both parties in every civil war."—*Vattel,* 244. 626. and to the same effect, 630.

That the present contest between Spain and her colonies is distinguished by all the features of a *civil war,* will not be denied.

The provinces are not contending for a redress of grievances, or to limit the authority of an acknowledged sovereign. ' They have rejected all authority but that which emanates from themselves—they have proclaimed their independence, and are in arms to support it.

It is a great convulsion of a mighty empire. There is no tribunal on earth to decide between them. The contest must be settled by their own swords.

What I have stated is conceived to be the law applicable to this subject. The law not only as written, but as founded on the great and general principles of justice, and consonant to the reason of mankind. The obligations it imposes were claimed by us during our own revolution, and almost uniformly recognized, not only by other nations, but by the mother country. Although sometimes violated to sooth the wounded pride of power, its force and efficacy have partially, at least, pervaded all similar contests.

Whatever, therefore, the courts of the United States might be bound to do, in cases involving the rights of citizens of their own country, I apprehend that they cannot be required, by one of the parties in this war, to decide on the rights or powers of the other.

Another view may be taken of this subject. I think it follows from the law, and the reasoning upon it, which have been brought to the consideration of this case, that whether the country to which the defendant claims

to belong has been recognized by the United States as independent, or not—or whether this court is bound to entertain and decide that question, or not—or whether the defendant be a citizen of this country, or not, yet, that in no event, can he be held liable in the way now proposed, and that this proceeding must eventually fail.

If the law to which I have referred must govern the case, of which I think there is no doubt, the parties in this war must be considered as regularly at war under the government and protection of the common laws of war; to be treated as prisoners of war; and on the ocean not pirates. If not pirates, then of course, acting under an authority that justifies their acts; and thus, individuals not liable as such. Whether or not, then, the independence of these provinces were recognized by the government or this court, the principles of this law, which places the parties on an equal footing in the view of foreign powers, and considers them as regular combatants, would still operate, and exclude the idea of individual responsibility in damages. If this be so, and I am not aware of any authority or principle that can, in any way, invalidate the position, then whether the defendant be a citizen of the United States or not, is immaterial. *Quoad* this transaction, he is a party to the war, standing, as regards the contending powers, on the footing of every other individual engaged in it; entitled to the same immunities, and not liable, in a civil suit, for damages that may arise to his adversary from acts committed in the prosecution of his employment. If it be objected that he is violating the laws of his own country in entering into this war, the answer is, that then, if there be such laws, he is liable, *criminaliter*, for their violation. But while a party in the war, acting under

NEW-YORK,
1818.

Stoughton
v.
Taylor.

the authority of a power, which, for the purpose of this war, must be considered on an equality with its opponents, I think he cannot be prosecuted in a civil suit.

Nothing is more common in Europe than for the subjects of one government to enter the military service of another; and they certainly incur none but the common hazards of war. It has never been pretended that they were subject to any personal liabilities not common to the original parties in the war; it is a matter of state, and the authority or government under which they act is alone responsible for their conduct. This remark is particularly applicable to this instance. If this be a public vessel, the property of the nation, then, most especially the acts of her commander, pronounced valid by her tribunals, are the acts of the nation.

A farther objection to taking jurisdiction of these cases, is, that the property has already been condemned by the sentence of a foreign tribunal, acting as a court of admiralty. It is no objection to the validity of the condemnation, that the proceedings were had in a part of Venezuela, if, as I understand the fact to be, Venezuela is an ally in the war. A condemnation in the port of an ally is good. It would be an anomaly in the law to entertain in one country an action for personal damages against the captor, when his prize had been legally condemned in the courts of another.

The courts of the belligerents have exclusive jurisdiction of the prizes made by their armaments. They have jurisdiction, not only of the question of prize, but of all its consequences.—This, as a court of a neutral nation, cannot take cognizance of prizes made by either. If the jurisdiction of the principal matter be exclusive, must it not be so in all matters necessarily incidental?

That this country, in a legal point of view, is to be considered neutral, is very clear—not only under the law of nations ; but this government, although it has not recognized the independence of the provinces in question, has officially assumed a neutral attitude. As far as any decision has been made, it has decided not to interfere, as announced by the President in his message. As neutrals, then, we must be impartial ; and if impartial, we should be as well bound to take cognizance of the causes of action alleged by the one party as by the other. Thus our court would be incessantly occupied with the controversies between the subjects of Ferdinand and the inhabitants of the colonies contending for their independence. This would be a strange administration of international law. On occasions of this kind, I apprehend they would only think themselves justified in extending their authority to cases implicating the rights or the conduct of our own citizens, or in protection of our neutral limits, as established by the public law of nations.

The preceding remarks dispose of all the points which were originally presented to my consideration in this case. In a late stage of its examination, however, another ground was taken and exclusively relied on, in opposition to this motion. It was contended, that the vessel by which these captures were made, *having been fitted out in the United States,* in violation of the act of June, 1794, the court would take jurisdiction of prizes made by her, and consequently, of this action.

My view of this subject has hitherto been confined to the general principles of national law which it involved ; but the earnestness with which this new position was maintained, and my respect for the counsel, who pressed his arguments with great zeal upon the attention of

NEW-YORK,
1818.

Stoughton
v.
Taylor.

the court, call for an examination of the decisions of the Supreme Court, in reference to the questions embraced by this controversy.

This will necessarily lead to a partial review of the principles I have already laid down, and will require a reference to additional authorities to support them.

I have already stated, that the courts of the belligerents have the exclusive jurisdiction of prizes made by their armaments. This, as a general rule, is too well established to admit of doubt or controversy. It has been adopted as public law for centuries, and uniformly maintained by the authority and practice of all the nations of Europe.

That the rule admits of exceptions is admitted—that this case forms one of them cannot be conceded.

The exceptions found in the books are as follows:

"All neutral powers reserve to themselves the right of adjudging the prize, in case the privateer should be accused of having made it within their jurisdiction; or in so far as the prize belongs to their own subjects, whether wholly or in part."

I have already recognized the principles of this rule, nearly in the same terms.

Sir William Scott, in the case of the Flad Oyen, seems disposed to limit the jurisdiction of neutral courts, to the "single case of an infringement of neutral territory"— that is, to captures made within neutral limits, which are admitted by the law of nations to extend to a marine league from the coast. The reason on which this exception is founded, applies to the other with equal force. If, as a neutral nation, we have a right to protect our territory from violation, it would seem to follow that we have the right to protect our citizens and their property

from oppression and plunder. It is very obvious, how-
ever, that belligerents have, at all times, and particularly
during recent wars, been very tenacious of their exclu-
sive jurisdiction in cases of captures made by their armed
vessels. They are extremely jealous of the interference
of third parties; and the decisions of the high Court of
Admiralty in England are at variance with those of the
Supreme Court of the United States, on the right of
neutrals to interfere their authority in matters of prize.
The former confines the right to " an infringement of the
neutral territory ;" the latter has gone a step farther,
and, although its decisions have fluctuated somewhat
since the organization of our government, as is apparent
from the cases of Glass v. The Betsey, and the United
States v. Peters, in 3 Dallas; yet from the cases of Talbot
v. Janson, the Onzeheren and the Alerta, the following
rule may be extracted:

That the courts of this country have jurisdiction over
captures made by foreign vessels of war, provided such
vessels were equipped here, and the prizes are brought
*infra presidia* of this country.

This modification of the rule is probably conceived to
be a right incident to that of protecting our territory from
infringement. Its exercise, however, is attended with
much difficulty, and it is, perhaps, worthy of considera-
tion, whether the neutrality of a country is not more
certainly and safely preserved by adhering closely to the
general rule, than by multiplying exceptions, and at-
tempting to regulate the exercise of equivocal and un-
important rights. The sensibility of belligerents is ever
active on the subject of their military and naval opera-
tions, and neutral interference, even in cases of acknow-
ledged propriety, is often productive of complaints and

NEW-YORK,
1818.

Stoughton
v.
Taylor.

NEW-YORK,
1818.

Stoughton
v.
Taylor.

perplexing controversies. The general rule is simple in its principles, and explicit in its terms : when our citizens complain to the tribunals of their own country of injustice and oppression, they must be heard, and the arm of the government must be extended to their relief : it is justified and required by the fundamental obligations of the social compact—protection is due to allegiance. When our territory is infringed, it must be protected :— this is a matter of plain, palpable right, on which rests the safety and integrity of every independent nation. But, what shall be considered an infringement of neutral territory ? The answer involves neither doubt nor dif-. ficulty :—neutral territory is violated by every hostile act committed within the jurisdictional limits of its government : neutral limits are well defined, and, at this day, well understood ; and making captures within them are acts so distinct and violent in their nature, and so injurious in their effects, as to satisfy at once the understanding and the reason of mankind. But how a capture on the high seas can be an infringement of our territory, a violation of our neutrality or sovereignty, is not so easily comprehended. There is difficulty in the expla-. nation ; abstruseness and complexity in the doctrine, which places our neutral rights upon nice and critical distinction, and upon the constructive operation of a general rule, otherwise plain and definite in its outline. It seems to me, that by the construction which has been thus adopted, the operation of the rule has been extended to the utmost limit which its principles will justify. The cases in which it was first applied were sufficiently gross ; they involved directly the dignity and responsibility of the government, and appealed forcibly to the justice of the court ; they presented the case of Ameri-

can citizens, pretending expatriation, pronounced fraudulent by the whole court, and obtaining commissions from a foreign government for temporary purposes ; American citizens, in fact, fitting out vessels belonging wholly to American citizens, making captures in our nieghbourhood, and bringing them immediately within our jurisdiction. More flagrant violations of our own laws, and of all neutral obligations, can hardly be imagined. But other occasions may arise, in which this extended application of the rule in question may generate great and serious perplexities. It cannot be intended, as would seem to be implied by the opinion of Judge Bee, in Moodie v. The Betsey, that a vessel fitted out in our ports, is so tainted by the illegality of that transaction, as to be rendered incapable of making a valid capture, under any circumstances, or at any distance of time or place : if not, when is her incapacity to cease ? Is it when she has been transferred, *bona fide*, by those concerned in her equipment, to an innocent purchaser, whether an individual or a government? or after her commander has been changed, or her commission renewed ? or after she has entered a port of her own government, and commenced a new cruise ? If, as Judge Bee contends, " vessels of war *so* fitted out, (that is in the neutral country,) are illegal *ab origine*, and no prizes they make lawful, as to the offended power," I am utterly at a loss to determine where their inability to capture legally terminates. It must be perpetual, if the principle be correct, or at least must continue while the vessel indures.

This view of the subject exhibits at once the difficulties in the application of the rule, as modified by our own courts. I have not suggested any improbable event ;

and in testing the correctness of a rule or principle, it is certainly admissible to trace its operation and effect upon any state of things that may be produced by common and natural occurrences.

It is farther stated, in the decision of the same case, that, " by the law of nations, no foreign power has a right to equip vessels of war in the territory or ports of another ; and that such acts are breaches of neutrality."

This position, I conceive, is laid down too broadly. I apprehend, it is not, in itself, a violation of the law of nations to equip vessels of war in a neutral port. It may be a departure from neutrality on the part of the nation that permits one belligerent to equip, and withholds the like privilege from the other ; but it is no breach of neutrality on the part of the belligerent, unless the act be interdicted. It is, therefore, common on the breaking out of hostilities between any two nations, for others who intend to remain neutral, to prohibit the belligerent to arm or equip within their territory or jurisdiction. The question is then presented, whether, if this prohibition be disregarded, the transgressor is punishable otherwise than under the municipal law of the country which enacts it. It seems to me, that, as it was not unlawful to arm or equip before it was interdicted by a local regulation, the punishment must be exclusively under the law which creates the offence. Neither are the citizens or subjects of one country or government prohibited by the law of nations to enter the military or naval service of another ; but as such conduct may compromit the neutrality of a nation, it is not unusual to prohibit it. The offence is declared, and the punishment provided, by the municipal law of their own country.

With great deference and respect, I have suggested some of the most obvious difficulties that may arise in the execution of the law, as now settled in the United States. It would not be difficult to show, that the principle upon which it rests, if pressed to the extent of its spirit, would lead to other inconveniences, and might open sources of collision with other nations, not easily closed against the angry spirit that pervades them.

But whatever may be my humble view, and hasty impressions of this subject, I yield them, without hesitation or reluctance, to the exposition of the law, as handed down to all inferior courts by the enlightened wisdom of the highest judicial tribunal in the country. Its decision on the subject is the law of the land, and emphatically the law of this court. It will be conceded, however, as a sound rule, that a law which, in its effects and operation, involves matters of great delicacy and national importance, is to be enforced only in cases fairly within its spirit and its terms. With a view, then, to apply it to the case before the court, it will be necessary to ascertain, with precision, what the law is, as settled by the Supreme Court of the United States.

Opinion of VAN NESS, J. The decision of Judge Bee, of the District Court of South-Carolina, in the case of Jansen v. Talbot, 3 Dal. 292. seems to be the first to have presented to the consideration of the Supreme Court, the effect of captures by vessels fitted out in our ports.

The judge, in delivering his opinion in that case, says, " this court, by the law of nations, has jurisdiction over captures made by foreign vessels of war of the vessels of any other nation with whom they are at war, *provided* such vessels were *equipped* here, in breach of our sove-

NEW-YORK,
1818.

Stoughton
v.
Taylor.

reignty and neutrality, and the prizes are brought *infra presidia* of this country. By the law of nations, and foreign power, its subjects, &c. has a right to equip vessels of war in the territory or ports of another. Such acts are breaches of neutrality, and may be punished by seizing the persons and property of the offenders. Vessels of war, so equipped, are illegal, *aborigine*, and no prizes they make will be legal *as to the offended power*, if brought *infra presidia*."

I have already stated some of my objections to the broad principles here laid down, and have merely referred to them again in this place, to point out more plainly what concurrence of circumstances is necessary, even upon the doctrines maintained in that case, to give jurisdiction to this court. It will be seen, that even in the opinion of that able judge, the vessels must not only have been *equipped here*, but their captures must be brought *infra presidia* of this country. That is deemed essential to vest jurisdiction in the court, and to institute the only proceedings that can be originated under the law of nations. 'Tis true, the court there says, that the offenders may be punished by seizing their persons and property ; but, surely, it does not mean under the law of nations. What is the offence ? Certainly it is no crime to capture enemy property on the high seas, under a valid commission, and in pursuance of instructions from a sovereign as supreme as our own. The captor is not only authorized, but bound, to make the capture ; and the utmost extent to which the doctrine I am examining can be strained, is to declare it unavailing and ineffectual, if brought within our jurisdiction : not that it was a crime to make it—the crime consisted in *equipping* the capturing vessel in our ports, which was pro-

hibited by a municipal law, and under that, if it provides a punishment and a penalty, the persons and property of the offenders may be seized. Under the law of nations, the court would only, I apprehend, set the captured property at liberty—declare the capture void, and as if not made. And here it becomes a natural inquiry, as directly connected with the case before me, whether the court would, under any circumstances, proceed to assess damages against the captor, supposing him to be the subject of a foreign prince, and duly authorized by his sovereign to make prize of enemy property. The act of making the capture would, in such case, be unquestionably legal, and if the capturing vessel had, at any time, been fitted out in the United States, the capture, if brought *infra presidia* its ports would be voidable only.

On no ground, then, of law or reason could a claim for damages be sustained. It is not possible, I conceive, for the courts of this country to punish, in damages, the subject of another government for executing the laws or mandates of his own sovereign without or beyond its jurisdiction. In the case of Jansen v. Talbot, allowances were made for interest and demurrage, but not in the shape of damages, and upon a very different principle, I apprehend, from that which would operate in a naked case of illegal equipment. There the whole transaction was American; the capturing vessel built in this country and owned by American citizens; the commander and his crew American citizens. He pretended an expatriation, but his home, his domicil, and that of his family, was still in this country; he set up a sale too, of the vessel, but the whole transaction was a fraud throughout. The capture, therefore, was illegal in its

NEW-YORK,
1818.

Stoughton
v.
Taylor.

inception. Not void only, but he had no right to make it. These features distinguish this case from that of the Den Onzeheren. There restitution of a prize was ordered in the District Court, on the ground that the force of the capturing vessel *had been augmented* in this country; but without damages, as the privateer was admitted to be French, and regularly commissioned. The decree, however, was reversed in the court above, on new evidence, which sufficiently repelled the charge of augmentation of force. I shall have occasion presently to recur for a moment to this view of the subject.

Both these cases recognize the principle that prizes made by armed vessels, either equipped originally, or whose force has been augmented here, are to be restored, "*if brought within our jurisdiction.*"

In Rose v. Himely, 4 Cr. App. 513. Mr. Justice Johnson lays down the principle as follows: "A prize brought into our ports would be in no wise subjected by that circumstance to our jurisdiction, except, perhaps, in the single case of its being necessary to assume the jurisdiction to protect our neutrality or sovereignty, as in the case of captures within our jurisdictional limits, or by vessels fitted out in our ports."

The expression of this opinion was produced by the discussion of an incidental point in that cause. The main question was not analogous to that under the consideration of this court.

In the case of the Alesta, 9 Cr. 359., Washington, Justice, delivered the opinion of the court, and states, "If the capture be made within the territorial limits of a neutral country, into which the prize is brought, or by a privateer which had been illegally equipped in

such neutral country, the prize courts of such neutral country not only possesses the power, but it is their duty, to restore the property so illegally captured to the owner."—Again : " All captures made by means of such equipments are illegal in relation to such nation, and it is competent to her courts to punish the offenders, and in case the prizes taken, are brought *infra presidia*, to order them to be restored.

These are all the cases which it seems necessary to examine. They afford a perfect view of the law, as laid down by the Supreme Court, and it is plain that the utmost extent of the doctrine they maintain, is, that captures made by vessels equipped in a neutral nation are illegal only in relation to such nation ; and if they are brought *infra presidia* her ports, restitution will be ordered—no other remuneration is held forth—no other resource is opened to the captured complainant. It will not be denied that an exception to a general rule is to be taken strictly : that it goes no farther than its terms clearly imply. Indeed, it would be impossible upon any unknown principles of admiralty or prize law, to take jurisdiction and award restitution under any other circumstances. No court can exercise prize jurisdiction, unless the *res ipsa, the corpus,* be actually, or constructively in its possession. If authorities be necessary to support a position so universally known and understood by every civilian, I refer to 2 Br. Civ. and Ad. Law, 100, 1, 2, 4 vol. 46. 4 Cr. 277. 297. 513, 14. 254.

I might now call upon the counsel for the plaintiff to prove, affirmatively, that their case is within the exceptions established by these decisions of the Supreme Court. They have furnished neither analogy nor prece-

dent for their proceeding, but have relied entirely on the irregular and unsound inference, that because the capture was illegal as to this country, it was illegal as to Spain; and that because the property would have been restored, if brought *infra presidia*, therefore, they will be permitted to pursue a personal remedy. But is it not fallacious— grossly fallacious to infer, that an act illegal as to the offended power, a neutral, must be so as to the opposing belligerent, and that because the property captured would be restored if brought within our jurisdiction; therefore, if it be not brought within it, we will give a remuneration in damages, through the medium of an action of trespass? This reasoning is unworthy of a formal refutation. It is destitute of all legal precision, and if permitted to prevail, would confound all the es- tablished distinctions between belligerent rights and neutral duties.

As no positive authority of any sort has been pro- duced to authorize this extraordinary proceeding, I should be justified by the usages of all courts to stop here, and order the defendant to be discharged; but I shall proceed to show, negatively, by authority, and by reasoning conclusive, (at least to my own mind,) that this action cannot be maintained, and that the plaintiff is not entitled to hold the defendant to bail.

Here it is proper to recur to a fact which will render the authorities to which I shall refer directly applicable to this case, to wit: that this capture was condemned by a court of admiralty, sitting and proceeding under the authority of the government that authorized the capture; or if the certificates of condemnation should be deemed irregular, or not sufficiently proved, yet that the prize

was carried *infra presidia* a port of the capturing power. It would be an idle waste of time, and trifling with the understanding of the profession, to cite many authorities to prove that a condemnation of a prize in a court of admiralty is binding and conclusive against all the world. The following abundantly show it :—T. Raymond, 473. Collect. Jurid. 153, vol. 1. 1 Dal. 78. Rose v. Himely, 269. 271. 282, 283. 4 Cr. 269. 271. 282, 283. 3 Dal. 86., in Penk v. Doane, Paterson, J. says,"" The sentence of a court of admiralty, or of appeal in questions of prize, binds all the world, as to every thing contained in it, because all the world are parties to it. The sentence, so far as it goes, is conclusive to all persons."

But if the condemnation has not been sufficiently proved, yet the prize was carried *infra presidia* the ports of the captor. That is undoubted.

. To prove that this excludes all remuneration in damages in the courts of the United States, I shall first cite the case of the United States v Feters, 3 Dal. 121. as directly in point. Most of the facts in that case were the same as in this : the capturing vessel was alleged to have been fitted out in the United States—the commander alleged to be an American citizen, and neither allegation denied ; but there were other facts, which made the case stronger than this, and pressed with great force upon the justice of the court. The property captured was *American*, but, as in this case, had not been brought into the ports of the United States, and damages were sued for by the *American* owner. The capturing vessel and her commander were both within the jurisdiction of the court, and both had been arrested by process issued out of the District Court of Pennsylvania,

and a motion was now made to the Supreme Court of the United States, for a writ of prohibition, directed to the District Court. Upon the argument, the very question now under consideration here, was raised, and stated in terms—that is, in the words of the reporter.

" The controversy turned principally upon this point : whether the District Court could sustain a libel for damages, in the case of a capture, *as prize*, made by a belligerent power on the high seas, when the vessel captured was not brought within the jurisdiction of the United States, but carried for adjudication *infra presidia* of the captors."

It will not be disputed that this is the very point I am called on to decide : and it must be remembered that the captain, in that case, was under arrest, as well as his vessel.

The Supreme Court, after solemn argument, directed a writ to issue, prohibiting the District Court from holding farther plea of the premises, and directing, forthwith, both the commander and his vessel to be released.

With this case on record, it is a matter of surprise, and worthy of animadversion, that this proceeding should have been attempted, and still more singular, that a refusal to sustain it should be deemed extraordinary and pregnant with alarming consequences.

I shall advert to one authority more. It is not a decision of the Supreme Court, but of a very enlightened judge, who elucidates every subject he examines with great ability and research, and whose judgments are entitled to the confidence and respect of every tribunal acting under the laws of the United States. It is the opinion of the Circuit Court of the United States for the first circuit, in the case of the Invincible, 2 Gall. 29.

I was referred to it, as showing that the court, in that case, recognized the doctrine laid down by the Supreme Court in Talbot v. Jansen, and the Alerta ; and so it was bound to recognize it, as is every subordinate tribunal ; so does this court, in the very terms in which it is given. Judge Story's construction and application of the law is precisely that which is adopted here. Alluding to the cases I have just cited, he says, " but allowing these cases to have the fullest effect the most liberal construction can impute to them, they only decide that the jurisdiction of our courts in matters of prizes made by foreign cruisers, attaches whenever the prize property is within our ports. In the case before us, the cruiser itself only is within the country, and not the captured ship in the character of prize. It is, therefore, clearly distinguishable."

The cruiser was in the country, and so was her commander, but not a word escaped the counsel or the court, that would authorize a pretence to hold him liable. If prize jurisdiction does not attach when the cruiser and the commander are both within the jurisdiction of the court, is not the conclusion irresistible and complete, that it does not when the latter alone is here ?

But more is said in this opinion applicable to this case.

After stating, that in general, in cases of marine torts, the admiralty will sustain jurisdiction, where either the person or his property is within the territory, and arrest either, he adds, " But it affords such remedies only where the tort is a mere marine trespass, *and not where it involves directly the question of prize.*" Farther—" In the next place, the principal question involved in a trial under such circumstances, necessarily is the question of prize." And again—" Whether damages shall in any

case of capture be given, must depend upon the law of prize, as understood, and administered by the foreign sovereign, in a case of probable cause, upon the subsequent conduct of the captors. The damages, therefore, are not an independent and principal inquiry, but a regular incident to the question of prize, in whatever manner the process may be instituted; and this consideration disposes of that part of the argument, in which it is assumed, that although a neutral tribunal may not directly entertain the question of prize, yet it may collaterally, when it is a mere incident to the question of damages."

This opinion supports all the positions I have taken in this cause. And as my attention had not been directed to it when I decided several points in the early stages of this controversy, it is a matter of great satisfaction to perceive, that the principles I maintained were in strict conformity to this exposition of the law.

The conclusion will no longer be resisted, I trust, that in matter of a prize, made by foreign cruisers, the courts of the United States can take no jurisdiction, unless the prizes be brought within our ports, although the capturing vessel be outfitted here; and it is proved as well as admitted, that when a neutral power does not take cognizance of the case, under one of the exceptions to the general rule, then the courts of the capturing power have the sole and exclusive jurisdiction.

It is next to be shown, that the court having exclusive jurisdiction of the principal question, has also of all its incidents and consequences. As this opinion has already been extended to a length somewhat unusual, I shall be concise in what remains to be said.

Two Cases in Carthew, p. 398. 474. are full to this

point, and also, Le Caux v. Eden, and Lindo v. Rodney
—Possine Daug.

" If the admiralty is possessed of a cause, it has a right to try every incidental question." 3 Dal. 6.

" The original act derived its quality from the intention of the seizure, which was as prize ; and the law precludes any court from deciding on the incident, that had no jurisdiction of the original question." 3 Dal. and Collect. Jurid. Silesia Coan.

" From the very nature of things, the question of damages must be determined by the same tribunal that determines the question of prize : it is an incident, and whoever takes cognizance of the principle question, must likewise take cognizance of that." 3 Dal. 126.
This is from the argument of counsel ; but it derives the weight of authority from the recognition of the opposite counsel in the one case, and of the court in the other.

Mr. Justice Johnson's opinion in Rose v. Himely, recognizes these principles as undoubted law ; and, as has been shown in the case of the Invincible, it is decided expressly, that the court not having jurisdiction of the question of prize, had not of the question of damages, in whatever manner they might be claimed.

Jurisdiction, then, of the question of prize, draws after it jurisdiction of all its incidents ; and, in the language of Mr. Justice Story, " damages are a regular incident to the question of prize." They are not only a regular, but an *inseparable* incident. There can be no damages for a *taking as prize*, unless the prize be tried and acquitted. It can only be tried in a prize court. By the constitution and fundamental laws of that court, it is not only authorized, but bound to give redress, by

NEW-YORK,
1818.

Stoughton
v.
Taylor.

way of damages, for a capture, which, upon the trial, proves to have been illegally made. They can no where else be ascertained and awarded. There are the parties to make, to hear, and repel each other's allegation —there are the papers, documents, and testimony, by which alone the court can be governed in its examinations and decisions. This investigation forms a part of the trial of the prize—the same facts that establish the character of the capture, viz : whether it be prize or no prize must determine whether there shall be damages or no damages. If they are not claimed in that court, they cannot be claimed elsewhere. The opinions of Buller and Lord Mansfield establish these positions beyond all controversy ; and that a distinct and independent action of trespass will not lie for a *taking as prize.*

A seizure *as prize* is no trespass, though it may be wrongful. The authority and intention with which it is done deprive the act of the character that would otherwise be impressed upon it. The tort is merged in the capture as prize.

It is one of the objects of a prize court to inquire into the authority by which the capture is made. If, by the authority of the sovereign, the original taking must be deemed legal, as to the party committing the act, the ultimate validity of the prize will depend on subsequent investigations ; but the party making the capture is justified by the orders of his sovereign. They convert the act of the individual into a matter of state. The moment an act is authorized or directed by the supreme power of a nation, the contest is national, not personal —the dispute is not between the individuals, but between their governments.

This capture is proved to have been made under the

authority of the government of Buenos Ayres: the defendant, therefore, incurred no personal responsibility. However the act may have been considered in relation to the *offended power,* if the prize had been brought *within its jurisdiction,* it was, unquestionably, legal as between the parties.

From all the decisions, therefore, of our courts, taken in connexion with the general principles of international law, the following rule indubitably results:—That captures made by means of equipments obtained here, if brought within our jurisdiction, shall not avail; but the capture, if authorized by the sovereign of the captor, is legal as between the parties; and if carried into his possession, or *infra presidia* his ports, cannot be recovered here. On this conclusion I rest with perfect confidence.

Enough has now been shown for the purposes of this case; but as it has been made the subject of animadversions, not altogether decorous or proper, I shall proceed to show, that upon principle and indisputable authority too, no suit or proceeding of any sort can be maintained in the courts of a neutral nation, by the subjects of one belligerent against the subjects of the other, for acts growing out of the war.

If an action of trespass could be maintained for an act committed beyond our jurisdictional limits, so could every other, calculated to repair the injuries and redress the grievances that would naturally flow from a state of war; and how preposterous would be the spectacle afforded by belligerents prosecuting each other in neutral courts in actions of trespass, false imprisonment, and even assault and battery. All their battles would be fought over again on neutral ground. But these things

NEW-YORK,
1818.

Stoughton
v.
Taylor.

are not permitted. Neutrals have nothing to do with questions of right or wrong between the belligerents, and will not suffer them to be agitated in their tribunals. This rule of conduct is prescribed by all writers who have treated of the rights and duties of neutrality. I shall cite a few authorities that are very explicit on this point.

" The neutral ought to consider as lawful whatever either of the belligerents may do to the other: and should regard no act of warfare as unjust. Those who are not judges between the contending nations, and who are no parties in the war, have no right to take cognizance of their acts, or to decide on the justice of their cause : it is necessary, therefore, that every act done by either of them, during the war, should be regarded by all neutral powers as lawfully done." 2 Az. 64.

" As between the belligerents the neutral is bound to see right, whenever he sees possession of a right unaccompanied by possession, he cannot take notice." Byn. 118. In this case the prize is in possession of the sovereign of the captor, and we, as neutral, are bound to consider that possession rightful.

" When a nation remains neutral in war, she is bound to consider it equally just on both sides, as relates to its effects, and, consequently, to look upon every capture made by either party as a lawful acquisition. To allow one of the parties to enjoy in her dominion the right of claiming things taken by the other, would be declaring in favour of the former, and departing from the line of neutrality." Chitty, 94. These principles are laid down by Vattel, in different places. C. 2, 3, 4.

I shall cite but one case, from Robinson, out of many that lie before me. In the Henrick and Maria, 4 Rob.

46, 47. Sir William Scott says, " The neutral state has nothing to do with the rights of force possessed by the one belligerent against the other; it has nothing to do with the enforcement or consummation of such rights; it owes to both parties the simple rights of hospitality, and even these are very limited in the practice of most civilized states."

" The neutral state can have no compulsory jurisdiction to exercise upon either party upon questions of war depending between them; nor can any such jurisdiction be conveyed to it by the authority of one of them."

These are the principles that prevail in the courts of Europe, and they have been recognized by our own.

In the case of the United States v. Palmer, 3 Wheaton, the Supreme Court says, " If the government of the union remains neutral, but recognizes the existence of a civil war, the courts of the union cannot consider as criminal those acts of hostility which war authorizes, and which the new government may direct against its enemy.

These principles are derived from elementary writers of established reputation, and adopted as rules of decision, as well in foreign as domestic tribunals, instituted for the administration of public law. They are founded in good sense, and seem to have anticipated the absurd consequences that would necessarily flow from permitting belligerents to pursue each other into neutral countries, and there seek civil remedies for acts of war.

It seems unnecessary to pursue any branch of this inquiry farther. Unless my view of the law, and the authorities I have submitted, are imperfect or fallacious, every position I have assumed has been supported by authorities alone binding and conclusive. Although

NEW-YORK, the blind zeal and hardihood of the partizan may resist
1818.
conviction, unprejudiced reason and common sense
Stoughton   must be satisfied.
v.
Taylor.          There is now no ground left on which this proceed-
ing can be sustained, and the defendant must be dis-
charged on common bail.